IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JARED SPENCER GRADELESS,

        Plaintiff,

v.          Case No. 22-1148-JWB

KANSAS STATE UNIVERSITY and ROSS UNIVERSITY
SCHOOL OF VETERINARY MEDICINE,

        Defendants.

**MEMORANDUM AND ORDER**

This matter comes before the court on Defendants' motions to dismiss. (Docs. 12, 19.) The matter is fully briefed and ready for decision. (Docs. 13, 14, 15, 20, 21, 22, 25.) For the reasons stated herein, Kansas State University's motion to dismiss (Doc. 12) is TAKEN UNDER ADVISEMENT and Ross University School of Veterinary Medicine's motion to dismiss (Doc. 19) is DENIED.

**I.    Facts and Procedural History**

Plaintiff attended Ross University School of Veterinary Medicine ("Ross" or "RUSVM") from 2017 to 2020. (Doc. 1 at 4.) Ross offers a veterinary program in St. Kitts which is primarily attended by American students. (*Id.* at 3.) Because most of these students wish to be veterinarians in the United States after graduation, Ross partners with American schools to allow students to complete their clinical rotations in the United States. (*Id.*) Plaintiff was set to start his clinical year in 2020 and intended to graduate in the spring of 2021. (*Id.* at 4.)

Plaintiff has a medical condition, malignant hyperthermia, which can cause a severe reaction to certain anesthesia medications. (*Id.*) Such a reaction can be life-threatening. (*Id.*) This reaction can be triggered by the anesthesia medications used in veterinary medicine. (*Id.*)

Plaintiff informed Ross of his medical condition but also indicated that he could participate in veterinary procedures involving anesthesia with an appropriate respirator. (*Id.*) Plaintiff alleges that he told Ross about his condition prior to his clinical year and that Ross's Associate Dean for Academic Affairs, Dr. Robert Gilbert, advised him not to take a required clinical course in anesthesia because the risks were too great. (*Id.*)

Plaintiff moved to Kansas in May 2020 to begin his clinical year at Kansas State University ("KSU"). (*Id.*) He informed KSU that he could participate in anesthesia activities with an appropriate respirator due to his condition. (*Id.*) While he was in his clinical placement, he was a student of both KSU and Ross. (*Id.* at 5.) Plaintiff received both feedback and grades from KSU professors for the clinical rotations he completed. This included a grade of a "D" for his Small Animal General Medicine course, which he took in the summer of 2020. (*Id.* at 6.) The professors noted that Plaintiff appeared to lack empathy because he did not use the animals' names and that he did not ask for help when he needed it. (*Id.* at 5–6.) Plaintiff suggests that perhaps this supposed lack of empathy was because when he wore a respirator, part of his face was obscured so it was difficult to see his facial expressions. (*Id.* at 12.)

In August 2020, Plaintiff began an orthopedic surgery rotation. (*Id.* at 6.) Plaintiff alleges that he did not receive any specific feedback regarding areas he needed to improve. (*Id.*) Near the end of the rotation, Plaintiff had a reaction to anesthesia used for a veterinary procedure. (*Id.*) Plaintiff failed the rotation and was told that he did not display necessary case management and planning skills. (*Id.*) In his evaluation for the course, Plaintiff was also praised for his empathy and care for patients. (*Id.*) Because Plaintiff had received two failing grades, KSU dismissed Plaintiff but indicated that he could petition for readmission. (*Id.*) Ross also informed Plaintiff that he would be dismissed from Ross unless he was readmitted to KSU. (*Id.*)

Plaintiff petitioned for readmission to KSU and was denied. (*Id.* at 7.) Plaintiff requested that Ross transfer him to a new clinical site and Ross declined to do so. (*Id.*) Plaintiff performed volunteer work assisting with small animal cases and surgeries at two placements in Manhattan, Kansas. (*Id.* at 8.) This provided him an opportunity to work until his readmission to KSU. (*Id.*) KSU readmitted Plaintiff in August 2021. (*Id.* at 9.)

Plaintiff began with a rotation in Veterinary Diagnostics Imaging. (*Id.*) He ultimately failed his final exam. (*Id.*) KSU permitted him to retake the final exam, which he failed a second time. (*Id.*) Plaintiff was informed that he was being dismissed immediately because he received a "D" in this rotation. (*Id.*) Combined with the earlier unsatisfactory grades he had received, this was enough to trigger automatic dismissal. Plaintiff was also automatically dismissed from Ross because of his dismissal from KSU.

Plaintiff appealed this dismissal with Ross's Academic Review Committee in October 2021. (*Id.*) In January 2022, Ross's registrar informed Plaintiff that his appeal was denied. (*Id.* at 10.) Plaintiff has no other opportunities to appeal Ross's decision and is not eligible for readmission at Ross. (*Id.*)

Plaintiff sued KSU and Ross for alleged violations of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"). (Doc. 1 at 11–15.) Plaintiff also brought a breach of contract action against Ross. (*Id.* at 16.) Plaintiff seeks injunctive and declaratory relief, asking to be readmitted to Ross and placed at another clinical site. (*Id.* at 13, 15–16.) Plaintiff also seeks compensatory damages, attorney fees, and costs. (*Id.* at 13, 15–16, 18.)

**II.      Standard**

To withstand a motion to dismiss for failure to state a claim, a complaint must contain enough allegations of fact to state a claim for relief that is plausible on its face. *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008). All well-pleaded facts and the reasonable inferences derived from those facts are viewed in the light most favorable to Plaintiff. *Id.* Conclusory allegations, however, have no bearing upon the court's consideration. *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

On a Rule 12(b)(6) motion, the court generally should not look to matters outside the pleadings. *Promotional Headwear Int'l. v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191, 1196 (D. Kan. 2020). "However, the Court may consider documents that are referred to in the complaint if they are central to the plaintiff's claim and the parties do not dispute their authenticity." *Id.* (considering insurance policy attached to complaint).

### III.     Analysis

Claims under Title II of the ADA (related to public accommodations) and Section 504 of the Rehabilitation Act are analyzed together because they involve the same substantive standards. *Miller ex rel. S.M. v. Bd. of Educ. of Albequerque Pub. Schs.*, 565 F.3d 1232, 1245 (10th Cir. 2009). To prevail on a claim under these provisions, a plaintiff is required to prove:

> (1) That he [or she] is a qualified individual with a disability;
> (2) That he [or she] was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and
> (3) That such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999) (alterations in original) (quoting *Tyler v. City of Manhattan*, 849 F. Supp. 1429, 1439 (D. Kan. 1994)).

Both Defendants moved to dismiss for failure to state a claim. (Docs. 12, 19.) Because each defendant raises distinct arguments, the court considers each motion in turn.

4

### A. KSU's Motion to Dismiss (Doc. 12)

KSU argues that Plaintiff has not sufficiently alleged intentional discrimination by KSU and that KSU cannot be vicariously liable for discrimination by its employees. (Doc. 13 at 1.) KSU also argues, in a footnote, that Eleventh Amendment immunity bars this suit, but concedes that this motion was not a proper vehicle for KSU to raise this argument. (*Id.* at 1, n.1.)

#### 1. Intentional Discrimination

KSU first argues that although Plaintiff requests injunctive relief against KSU, Plaintiff truly only seeks compensatory damages from KSU. (*Id.* at 6.) Because Plaintiff only seeks compensatory damages from KSU, KSU argues that Plaintiff must show that KSU intentionally discriminated against him. (*Id.*) It is true that Plaintiff purports to request injunctive relief against KSU. (Doc. 1 at 13, requesting injunctive relief in Count I against KSU.) But the court agrees with KSU that the true injunctive relief requested would come from Ross.

Plaintiff requests "injunctive and declaratory relief to obtain readmission to RUSVM's veterinary program and a transfer to another clinical site to complete his clinical year." (*Id.* at 13, ¶71.) Nothing in that request seeks relief from KSU. In his response to KSU's motion to dismiss, Plaintiff argues that he must seek injunctive relief from KSU, because it was KSU's dismissal of Plaintiff which triggered Ross's dismissal of Plaintiff. (Doc. 14 at 4.) And Plaintiff is correct, the dismissal process started with KSU's actions. But Plaintiff does not seek to be readmitted at KSU or to continue his clinical studies at KSU. Plaintiff seeks to be readmitted at Ross and to have a fresh start at a new clinical placement. On its face, Plaintiff's complaint does not seek injunctive relief from KSU. And while Plaintiff is correct to note that "[a] complaint is neither an injunction nor a judgment; it merely puts the defendant on notice of the plaintiff's claims," *Jenny Yoo Collection, Inc. v. Essence of Australia, Inc.*, Case No. 17-CV-2666-JAR-GEB, 2019 WL

5

2717167, at *5 (D. Kan. June 28, 2019), Plaintiff here has not put KSU on notice of the alleged injunctive relief requested.

Plaintiff also summarily requests declaratory relief from KSU. The Tenth Circuit has been clear that "in the context of an action for declaratory relief, a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011). Here, Plaintiff makes the same argument for declaratory relief as he does for injunctive relief – that the dismissal process from Ross began because of the dismissal from KSU, so his request for relief starts there. But again, Plaintiff does not request any action from KSU because he does not wish to be readmitted to KSU or to resume his studies there. This request for declaratory relief would be merely "a retrospective opinion that he was wrongly harmed by the defendant." *Id.* Thus, Plaintiff seeks only compensatory damages from KSU, and the court moves on to the next step of KSU's argument.

When seeking monetary relief, a plaintiff must show that the discrimination was intentional. *Hans v. Bd. of Shawnee Cnty. Comms'rs*, 775 F. App'x 953, 956 (10th Cir. July 26, 2019) (unpublished) (citing *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009)). "[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Barber*, 562 F.3d at 1228–29 (quoting *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999)). To show deliberate indifference, a plaintiff must show both: "(1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that … likelihood.'" *Id.* at 1229 (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). A failure to act requires more than mere negligence; the failure to act must be at least somewhat deliberate. *Id.*

6

The facts Plaintiff alleges, accepted as true, show that KSU was aware that Plaintiff suffered from malignant hyperthermia and needed certain accommodations. But Plaintiff's own complaint perhaps undermines his position that KSU intentionally discriminated against him. As to Plaintiff's unsatisfactory grade in Small Animal General Medicine, Plaintiff seems to suggest that his professor believed he lacked empathy because he wore a respirator for anesthesia procedures which partially obscured his face. But then when Plaintiff received an unsatisfactory rating for his orthopedic surgery rotation, he was praised for his empathy. Presumably, Plaintiff wore a respirator which obscured his face for those surgical procedures as well, so perhaps Plaintiff's respirator was not the problem after all.

However, there are multiple interpretations of these facts. Another plausible interpretation is that Plaintiff's lack of empathy in one course and then praise for empathy in another suggests that the feedback he received was not genuine. This may suggest that KSU's professors knew about Plaintiff's disability and were deliberately indifferent in providing him feedback and grades because of his disability. For this reason, the court cannot conclude that there is no plausible interpretation of the facts Plaintiff has pleaded which may entitle him to relief, and the court denies KSU's motion to dismiss as to this argument.

2. *Vicarious Liability*

Additionally, KSU argues that it cannot be vicariously liable for the behavior of its employees or agents. (Doc. 13 at 11.) The United States Supreme Court has not determined whether vicarious liability against a public entity is available for Title II or Section 504 claims, nor has the Tenth Circuit. But the Supreme Court has spoken about vicarious liability under an analogous statute, Title IX. *See Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998) ("[W]e hold that a damages remedy will not lie under Title IX unless an official who at a minimum

has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails to adequately respond.").

The Supreme Court has also gone on to mention the issue (albeit, without deciding) in later cases. *See City and Cnty. of S.F., Cal. v. Sheehan*, 575 U.S. 600, 610 (2015) ("…the parties agree that such an entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees…. But we have never decided whether that is correct, and we decline to do so here, in the absence of adversarial briefing."). Several circuits have looked at this issue and agreed with the reasoning in *Gebser*. *Ingram v. Kubik*, 30 F.4th 1241, 1256–59 (11th Cir. 2022); *Jones v. City of Detroit, Michigan*, 20 F.4th 1117, 1119–22 (6th Cir. 2021); *Montgomery v. District of Columbia*, 2022 WL 1618741, at *14–16 (D.D.C. May 23, 2022) (slip copy); *Hooper v. City of St. Paul*, 2019 WL 4015443, at *9–14 (D. Minn. Aug. 26, 2019) (not reported in F. Supp.).

Still, other circuits have concluded that vicarious liability is available under Title II and Section 504. *See Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574–75 (5th Cir. 2002); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001); *Rosen v. Montgomery Cnty., Md.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997). Notably, though, the *Rosen* case in the Fourth Circuit predates the *Gebser* Supreme Court case and relies on a case involving Title I of the ADA, which is a materially different provision. *See Hooper*, 2019 WL 4015443, at *11. And *Delano-Pyle* relies on *Rosen* in its reasoning. *Id.* Accordingly, the cases deciding that vicarious liability is available are not persuasive.

The court finds the reasoning of *Gebser* applies to Title II and Section 504 and that the statutory language at issue here points to the conclusion that vicarious liability is not available. As

previously mentioned, Section 504 cases and Title II ADA cases involve the same substantive standard and cases often analyze those issues together. *Miller ex rel. S.M.*, 565 F.3d at 1245. Title II of the ADA explicitly incorporates the "remedies, procedures, and rights" set forth in the Rehabilitation Act. 42 U.S.C. § 12133. In turn, the Rehabilitation Act explicitly incorporates the "remedies, procedures, and rights" set forth in Title VI of the Civil Rights Act of 1964. 29 U.S.C. § 794a(a)(1). And Title VI and Title IX are to be interpreted in the same manner because they are parallel statutes and Title IX was modeled after Title VI. *Gebser*, 524 U.S. at 286. Accordingly, the Supreme Court's interpretation of Title IX in *Gebser* logically also applies to Title II of the ADA and the Rehabilitation Act.

The language in Title II of the ADA, as compared to the language in Title I, leads to the same conclusion. Title I of the ADA prevents discrimination by employers and defines an employer as "a person engaged in an industry affecting commerce … and any agent of such person …" 42 U.S.C. § 12111. Title II of the ADA prevents discrimination by public entities and defines "public entity" broadly but *does not* include agents. *Id.* § 12131. Because Congress explicitly included agents in the application of Title I but did not include agents in the application of Title II, the court can conclude that Congress did not intend for vicarious liability to be available to hold public entities responsible.

Plaintiff disagrees with KSU's argument and argues that because KSU can only act through its employees or agents, Plaintiff does not need to demonstrate vicarious liability to survive this motion to dismiss. (Doc. 14 at 9.) Alternatively, Plaintiff argues that a motion to dismiss is not an appropriate time for the court to analyze vicarious liability. (*Id.* at 10.) As already explained, the court concludes that vicarious liability is not available under Title II or Section 504. Plaintiff has not alleged in his complaint that any KSU official with authority to correct the alleged

9

discrimination knew about the alleged discrimination and failed to correct it. Thus, Plaintiff has not plausibly alleged a claim against KSU.

Plaintiff has requested to amend his complaint should the court agree with KSU that Plaintiff has not alleged sufficient facts to survive dismissal. (Doc. 14 at 10.) The court finds it appropriate to allow Plaintiff leave to file a first amended complaint to address the identified deficiency.

### B. Ross's Motion to Dismiss (Doc. 19)

At the outset, the court must decide whether it can rely on the exhibits attached to attorney Paige Lohse's declaration. (Doc. 21.) According to Ms. Lohse, these exhibits are "indisputably authentic copies" of documents relevant to Plaintiff's claims. (*Id.* at 1.) The court may consider an indisputably authentic copy of a document if the document is referenced in the complaint and is central to the plaintiff's claim or claims. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). The rationale behind this rule is that a plaintiff should be aware of that document's contents because the complaint refers to the document, and so there is no need to offer the plaintiff an additional opportunity to respond as when the motion is converted. *Id.* at 1385.

Here, Plaintiff objects to Ross's exhibits, arguing that Ross has improperly asked the court to weigh the evidence at the motion to dismiss stage. (Doc. 22 at 3–4.) The court agrees that it is improper for it to consider these exhibits at this stage in the proceedings and accordingly, the court looks only to the motion to dismiss (Doc. 19) and the memorandum in support (Doc. 20) without considering the outside materials attached to Ms. Lohse's declaration (Doc. 21). Of course, most importantly, the court considers the factual allegations in the complaint to determine if they show a plausible claim for relief. (Doc. 1.)

*1. Extraterritorial or Domestic Application of Federal Law*

Ross argues that Title III of the ADA and Section 504 of the Rehabilitation Act do not apply to it because it is an institution located in St. Kitts, West Indies and because the relevant conduct at issue took place in St. Kitts, West Indies. (Doc. 20 at 11–15.) Plaintiff argues that the focus of the analysis is where the individual with a disability was located, and because he was located in the United States during the relevant time period, these laws apply. (Doc. 22 at 5.)

First, the court considers whether Title III of the ADA and Section 504 of the Rehabilitation Act allow for extraterritorial application. *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016) (explaining two-step process for analyzing exterritoriality issues). Plaintiff argues, without any citation to case law, that both statutes apply extraterritorially because Ross receives federal financial assistance from federal student loans and because Ross entered into the Program Participation Agreement ("PPA"). (Doc. 22 at 8.) Ross argues that statutory interpretation makes clear that neither statute applies extraterritorially. (Doc. 20 at 11–12.) Ross also argues that it is irrelevant that Ross receives federal financial assistance from student loans and that it entered into the PPA. (*Id.* at 13–14.) This is where the arguments appear to become muddled between step one (extraterritorial application) and step two of the analysis (whether this is a domestic application). *RJR Nabisco*, 579 U.S. at 337.

Looking at the language of the applicable statutes, Title III of the ADA and Section 504 of the Rehabilitation Act do not allow for extraterritorial application. Title III of the ADA does not explicitly include any language that would allow for extraterritorial application. Importantly, Title I of the ADA *does* include explicit language which allows the law to be applied extraterritorially. 42 U.S.C. § 12111(4) ("The term 'employee' means an individual employed by an employer. With respect to employment in a foreign country, such term includes an individual who is a citizen of

11

the United States."). Because Congress clearly knew how to apply one provision of the ADA extraterritorially, and did not include that language in Title III, it is clear that Title III of the ADA does not allow for extraterritorial application. And the language of the Rehabilitation Act specifically states that it applies when the qualified individual with a disability is *in the United States*. 29 U.S.C. § 794(a) ("No otherwise qualified individual in the United States …"). Accordingly, neither statute allows for extraterritorial application.

Other courts to consider the issue have disregarded the fact that an international institution receives federal funding. *Galligan v. Adtalem Global Educ. Inc.*, 2019 WL 423356, at *3 (N.D. Ill. Feb. 4, 2019); *Archut v. Ross Univ. Sch. of Veterinary Med.*, 2012 WL 5867148, at *10 (D.N.J. Nov. 19, 2012), *aff'd*, 580 F. App'x 90 (3d Cir. Oct. 31, 2014).

> While federal funds are distributed to many institutions, some of which are beyond the physical territory of the United States, Congress failed to mention that these anti-discrimination standards for institutions receiving assistance were to follow wherever the money went. Without an express extension of the statute to foreign institutions receiving federal financial aid, it cannot be implied that Congress actually intended such extraterritorial application. The inclusion of "any program or activity receiving Federal financial assistance" is not a clear communication indicating that Congress intended foreign institutions receiving money to also be subject to these restrictions aimed at equalizing domestic educational, professional, or social opportunities for disabled individuals within the United States.

*Archut*, 2012 WL 5867148, at *10. The court agrees with this reasoning and concludes that neither the Rehabilitation Act nor the ADA include express application to extraterritorial conduct, even if an institution receives federal funding.

The court does not have a copy of the PPA before it. Plaintiff alleges, upon information and belief, that in the PPA, Ross affirms that it is subject to and will comply with various federal laws and regulations. (Doc. 1 at 3 ¶14.) While this is a factual allegation (the fact that Ross affirmed it was subject to and would comply with various federal laws and regulations), the

affirmation's legal effect is yet to be seen. The court cannot assess at this phase whether the agreement binds Ross to follow federal laws, even if they would not otherwise apply.

Next, the court must determine whether this case involves a domestic application of the statute by looking at the focus of the statute. *RJR Nabisco*, 579 U.S. at 337. The court considers which party's location is relevant to the analysis, Plaintiff's or Ross's. The factual allegations in Plaintiff's complaint establish that Plaintiff was in the United States during all the relevant events in question. (Doc. 1 at 4, ¶22) ("He then moved to Kansas and began his clinical year at KSU in May 2020."). The court is without sufficient facts to establish where Ross employees were during the events in question, as the court does not consider exhibits attached by Ross.

When examining the focus of the ADA and the Rehabilitation Act, other courts have concluded that "[t]he focus is centered on acts that constitute exclusionary or accommodating decisions. Thus, the location of the actor when such decisions are made is important, not the citizenship of the person affected by the decision." *Archut*, 2012 WL 5867148, at *9. As for failure to accommodate claims, "the focus of the [Rehabilitation Act] and the ADA is the elimination of acts or omissions that constitute failures to provide reasonable accommodations." *Awodiya v. Ross Univ. Sch. of Med.*, 857 F. App'x 533, 535 (Mem) (11th Cir. May 24, 2020). Thus, the location of the Ross decisionmakers is what matters to determine whether this is a domestic application of federal law. The court has already noted that it does not have sufficient facts to discern the location of Ross employees. Perhaps they were all located in St. Kitts at the time they were acting in relation to this claim, but they may have been in the United States or anywhere else in the world. Because the court is without sufficient facts at this stage to determine where Ross employees were while undertaking this allegedly discriminatory conduct, the court must deny Ross's motion to dismiss on this basis.

   *2. Breach of Contract*

Breach of contract is a state law claim. *See Jamieson v. Vatterott Educ. Ctr., Inc.*, 473 F. Supp. 2d 1153, 1158–59 (D. Kan. 2007). A federal court sitting in diversity must apply the law that the forum state would apply, including the forum state's choice of law principles. *Id.* In Kansas, courts follow the theory of lex loci contractus which means they apply the law of the state where the contract was made. *Id.* As in *Jamieson*, here, the parties provide no facts indicating where the alleged contract was formed, but both parties base their arguments in Kansas law. (Doc. 20 at 15) ("Plaintiff's allegations fail to establish the law that governs this contract, and therefore, for purposes of this motion only RUSVM contends that Kansas contract law is the appropriate substantive body of law to fully and finally address this issue.")[1] Accordingly, the court utilizes Kansas contract law.

Ross argues that Plaintiff fails to mention a specific contractual promise that Ross broke and that Plaintiff's claims amounts to "educational malpractice," a tort that Kansas does not recognize. (Doc. 20 at 15–20.) Plaintiff contends that the basic relationship between student and a college or university is contractual in nature and that Plaintiff has identified a specific provision of the student handbook which was violated, a term of the alleged contract. (Doc. 22 at 11–13.) Plaintiff also argues that Ross is attempting to "recast" his breach of contract claim as educational malpractice when it truly is a breach of contract claim. (*Id.* at 14.)

Plaintiff's Count III contains several allegations related to the alleged contract. (Doc. 1 at 16–18.) Many of these allegations are legal conclusions rather than factual allegations. (*Id.*) For example, Plaintiff pleads that "[t]he law imposes a contract on the relationship between students

---

[1] In its briefing, Ross next contends that "to determine what law actually applies further discovery will be required if this claim is not dismissed with prejudice, because the law is very likely that of St. Kitts, West indies, where RUSVM is located and where Mr. Gradeless was a student." (Doc. 20 at 15.)

14

and universities, and the materials actually provided to students may become part of the agreement." (*Id.* at 16, ¶85.) The court disregards the legal conclusions that Plaintiff pleads and is left with an important fact regarding the handbook. Plaintiff pleads that the handbook states:

> It is RUSVM's policy to provide an environment free of unlawful harassment or discrimination based upon race, creed, color, religion, national origin, sex, age, disability, marital status, sexual orientation, gender identity or expression, citizenship status, or any other category protected by applicable law. RUSVM complies with all applicable laws regarding discrimination, harassment, retaliation, and equal opportunity.

(*Id.* at 16–17, ¶89.) Plaintiff goes on to explain the ways he contends Ross breached this contractual promise and failed to act in good faith. (*Id.* at 17–18.)

Kansas courts have recognized that "the basic legal relation between a student and their university or college is, in some aspects, contractual." *Vasquez v. Cleveland Chiropractic Coll., Inc.*, 519 P.3d 802 (Table), 2022 WL 16704372, at *6 (Kan. Ct. App. Nov. 4, 2022). Another judge of this court found "that Kansas would adhere to those cases which bar 'any attempt to repackage an educational malpractice claim as a contract claim' because the policy concerns militating against educational malpractice also exist in contract claims which attack the general quality of education." *Jamieson*, 473 F. Supp. 2d at 1160. But *Jamieson* also recognized that a specific contractual provision, such as "[a] promise to provide a specific number of hours or weeks of instruction," could be enforced. *Id.* Handbooks, policies, and other documents provided by the college to the student can be considered part of that contract. *Vasquez*, 2022 WL 16704372 at *6.

A policy to provide an environment free from discrimination or harassment is more in line with a specific contractual promise than an attack on the general quality of the education. *See Buschauer v. Columbia Coll. Chi.*, 2021 WL 1293829, at *4 (N.D. Ill. Apr. 6, 2021) (slip copy) ("But the Court agrees with those courts that have addressed similar tuition refund cases in the wake of COVID-19 that, at least at this stage, Buschaer's claims do not require the Court to

15

consider the quality of the online instruction he received but rather whether Columbia failed to provide Buschauer with the on-campus, in-person instruction and services it allegedly promised."). While it is not as clear cut as a promise to provide a certain number of hours or weeks of instruction, a policy or promise to provide an environment free from discrimination or harassment does not require a court to consider the quality of the education provided. The court concludes that this is not an attempt to repackage an educational malpractice claim as a breach of contract claim.

This court recognizes that generally, the relationship between a student and a university is contractual in nature. Plaintiff pleads, in conclusory fashion, that the relationship is a contractual relationship and that the handbook "spelled out" the contractual rights. (Doc. 1 at 16, ¶¶85–87.) Earlier in his complaint, Plaintiff pleads that during his clinical rotation, he remained a Ross student, paid tuition to Ross, and remained subject to Ross's handbook and policies. (*Id.* at 5, ¶23.) While it is not clear at this stage whether Plaintiff will successfully show that a contract exists and that Ross breached that contract, Plaintiff has pleaded a plausible claim that a contract exists between himself and Ross. Through discovery, it may become clear that there is limiting language in the handbook which shows it is not a part of a contract. Or perhaps the evidence will show that St. Kitts law applies, rather than Kansas law. For now, though, Plaintiff has sufficiently pleaded that a contract exists and that it was breached by Ross.

**IV.  Conclusion**

For the reasons stated herein, KSU's motion to dismiss (Doc. 12) is TAKEN UNDER ADVISEMENT and Ross's motion to dismiss (Doc. 19) is DENIED. Plaintiff shall file his first amended complaint within 14 days of the date of this order. If Plaintiff does not do so, the court may grant KSU's motion to dismiss (Doc. 12) without further notice.

IT IS SO ORDERED this 16th day of March, 2023.

                                                             _s/ John W. Broomes_  
                                                             JOHN W. BROOMES  
                                                             UNITED STATES DISTRICT JUDGE